NATALIE K. WIGHT, OSB #035576
United States Attorney
District of Oregon
**SCOTT M. KERIN, OSB # 965128**
Assistant United States Attorney
Scott.Kerin@usdoj.gov
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000
Attorneys for United States of America

# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

# PORTLAND DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **3:24-mj-00215** |
| **v.** | **GOVERNMENT'S MOTION FOR PRETRIAL DETENTION** |
| **BIAO LIN,** | |
| **Defendant.** | |

The United States of America, through Natalie K. Wight, United States Attorney for the District of Oregon, and Scott M. Kerin, Assistant United States Attorney, hereby asks the Court to detain the defendant pending arraignment and trial as a risk of nonappearance and danger to the community.

Defendant is charged in a criminal complaint with engaging in a Conspiracy to Commit Mail and Wire Fraud for his involvement in a large criminal network that is targeting and defrauding elderly citizens across the United States out of millions of dollars. Defendant's role in this scheme was to act as a courier traveling across the United States picking up gold bars that

**Government's Motion for Pretrial Detention** **Page 1**

the victims' had been scammed into turning over to this criminal organization. Defendant is a citizen of the People's Republic of China (PRC). It appears that he entered the United States illegally sometime in 2019 and has a pending application for legal status. Defendant lives in Brooklyn, New York and his only ties to Oregon are his involvement in this criminal conspiracy. In addition to his involvement in the Oregon crime, a person matching defendant's appearance and driving a car registered to him was also identified as a courier who picked up four separate packages containing gold from another fraud victim on the East Coast that totaled $580,000. Defendant presents a serious risk of flight and his fraud scheme presents an ongoing danger to the public. He should be detained.

**A.    Factual and Procedural Summary.**

The defendant was part of a criminal organization targeting and defrauding elderly citizens across the United States out of millions of dollars. In this case the group hacked the victims' computers and then, under the pretense of being government officials trying to help them, convinced them that the only way to protect their assets was to convert them into gold for safekeeping by the U.S Treasury. It was all a scam – but it resulted in innocent victims suffering very real and significant losses.

Defendant, a resident of Brooklyn, New York, was a courier for this organization. On Thursday, October 3, 2024, defendant flew from the East Coast into Spokane, Washington, rented a car, and then drove to Portland, Oregon intending to pick up two packages from the victims that were supposed to contain $466,043 in gold bars. This time, however, the packages did not contain gold and the Federal Bureau of Investigation (FBI) was waiting to arrest him after he took possession of them.

///

**Government's Motion for Pretrial Detention**                                          **Page 2**

Defendant was arrested on Friday afternoon, October 4, 2024.  On Saturday night, October 5, 2024, he was charged in a criminal complaint with engaging in a Conspiracy to Commit Mail and Wire Fraud, in violation of Title 18, United States Code, Sections 1341, 1343, and 1349.  He faces a maximum sentence of imprisonment of  up to 20 years' imprisonment, a fine of up to $250,000, and three years of supervised release.

This particular case came to the attention of the Portland FBI on October 2, 2024, when Adult Victim 1 (AV1) walked into the Portland Field Office of the FBI with her husband, Adult Victim 2 (AV2), and her son, to report she and her husband had been defrauded out of millions of dollars in gold bars at the direction of someone named "Michael Lewis" (hereinafter "Lewis").  Further, AV1 was still in contact with Lewis, and they were expected to provide additional gold at Lewis's direction within the next few days.  At the time of their reporting to the FBI on October 2, 2024, AV1 was 86 years old, and AV2 was 93 years old, and they had lost more than $3 million, as a result of this scheme.  AV1 and AV2 are residents of Portland, Oregon.

According to the victims this all started on or about June 10, 2024, when AV1 tried to access her online accounts with Vanguard Group, where she had a trust account containing several million dollars, as well as an IRA with several millions of dollars as well.  However, instead of gaining access to her account, AV1 was notified her password was not working, and she was locked out of her account.  AV1 was then called by someone purporting to be with the Vanguard fraud department and they told AV1 she had been locked out.  In fact, AV1 was not contacted by someone from the Vanguard Group, but rather someone purporting to be who was instead a part of this fraud scheme.

///

**Government's Motion for Pretrial Detention**                                        **Page 3**

AV1 was then called again by someone who identified himself as "Christopher Tyler" (hereinafter "Tyler"), also purportedly with the Vanguard fraud department. He was not. Tyler told AV1 her account had been hacked, that her Social Security number had been stolen and they had reported this to the Social Security Administration, that someone had tried to steal money from her Vanguard account, and that she had to take certain safety procedures to ensure her accounts would be safe. AV1 was then put in touch with "Anna Graves" (hereinafter "Graves"), purportedly with the fraud section of the Social Security Administration; Graves in turn put AV1 in touch with "Michael Lewis" (hereinafter "Lewis"), who was purportedly with the Social Security Administration and was being assigned to her case. He was not actually with the Social Security Administration but rather another member of the fraud scheme. AV1 began communicating with Lewis with the goal of protecting her accounts from fraud.

On or about June 11, 2024, at Lewis's direction, AV1 installed on her computer a software program called UltraViewer. According to UltraViewer's website, it is a free remote desktop software, which allows a user "to remote control your client's computer to support them like you're sitting in front of the screen." Lewis also asked for information about AV1's personal life, including details about her banking institutions, grocery stores, and neighbors. Lewis told AV1 he did not know the identities of the hackers putting AV1's accounts at risk, so AV1 must not tell anyone else or go on the Internet to seek information.

Lewis told AV1 that Vanguard only insured accounts up to a certain amount and since AV1 had more than that in her accounts, Lewis advised AV1 she had to move her money or else she would lose her money to these hackers. Lewis then directed AV1 to go to US Bank to buy gold bars as a way to safeguard her assets and that she then needed to transfer the gold to the

///

**Government's Motion for Pretrial Detention**                                    **Page 4**

U.S. Treasury for safekeeping, and after her accounts were deemed safe, they would transfer it back to her.

On or about June 24, 2024, AV1 used her US Bank account to initiate a wire transfer in the amount of $466,043 USD to purchase gold bars, as directed by Lewis.  Upon successful completion of this first purchase and conveyance of the gold bars, AV1 returned to US Bank to repeat the process and buy additional gold bars.  However, US Bank refused to carry out the transfer.  Lewis directed AV1 to open a new account at the Washington Federal Bank.  The rest of the gold purchases were made via wire transfer from the Washington Federal account, which was funded by AV1's Vanguard accounts.

Throughout the weeks that followed, AV1 continued to purchase gold bars at the direction of Lewis.  These purchases were made with several different online gold vendors. Lewis initiated the wire transfer with Washington Federal for each purchase, and Lewis would advise AV1 to be available to verify the transaction with the bank.  Soon thereafter, AV1 would receive an automated call from the bank asking her to verify the transaction.

Upon receipt of the gold bars via FedEx, AV1 took pictures of the gold bars and accompanying packing slips.  The photos were sent to Lewis via text message, who would then contact her soon thereafter to repackage the gold bars on video.  AV1 repackaged the gold bars at Lewis's direction, as he watched on video, wrapping them in Christmas or birthday paper.

Within a short amount of time, Lewis then recontacted AV1 to advise that a courier was on their way or imminently arriving to pick up the package.  At this time, Lewis would provide AV1 with a password and tell her to ask the courier for the password before giving them the package.  A courier would then arrive at her home, AV1 would ask the courier for the password,

///

**Government's Motion for Pretrial Detention**                                    **Page 5**

and then would hand the courier the package after receiving the password. Typically, Lewis remained on the phone with AV1 during the pickup.

AV1 said that the couriers were not from UPS, USPS, or FedEx, and they were dressed in normal attire. On several occasions, the courier was the same male individual, identified only as "Kevin." However, the last pick up before AV1 visited the FBI, the courier was an Asian woman accompanied by an Asian man in a car.

On each occasion, sometime after the package was conveyed, AV1 received from Lewis, via the Internet, what purported to be a U.S. Treasury check for the value of the gold bars. This process of purchase, repackaging, and pick up of the gold bars was repeated on multiple occasions, resulting in a total loss of over $3,000,000 in gold.

On or about October 1, 2024, AV1 again made a purchase of gold bars via an online vendor in the amount of $462,398, as directed by Lewis. Since the time of that purchase, AV1 revealed the situation with Lewis to her son and the FBI. AV1 expected to receive the gold bars via FedEx with three to four days. Lewis continued to contact AV1 on October 2 and 3, 2024, but AV1 told Lewis her husband was in the hospital to limit interaction.

On or about October 3, 2024, AV1 was notified by FedEx that the package would be delivered to her residence in Portland, Oregon between 9:00AM and 1:00PM on Friday, October 4, 2024. AV1 believed Lewis was also likely to know when the package was scheduled for delivery, as she had observed him access her computer to view emails and other items. Lewis would then expect her to immediately repackage the gold bars on video. Further, AV1 expected that soon after repackaging the items, a courier would arrive at her house with a password to pick up the package. Agents advised AV1 to let Lewis know her husband was out of the hospital, and FBI Agents prepared a controlled pickup operation that took place on October 4, 2024.

**Government's Motion for Pretrial Detention**                                                        **Page 6**

On October 4, 2024, FBI Agents instructed AV1 to proceed with the process she had previously followed upon receipt of the gold via FedEx. AV1 took photos of the gold, which consisted of five one-kilogram gold bars and three smaller 100-gram gold bars, and sent them via text message to Lewis, then she waited for his direction to repackage them on video. FBI Agents also directed AV1's son to assist with preparing a decoy package, which would not actually contain gold bars, to be handed to the courier. A picture of the gold bars is below:



At approximately 11:25PM, Lewis advised AV1 two couriers[1] would be coming for pick up, and the couriers may not arrive until 2:30PM or 3:00PM. Lewis then proceeded to direct AV1 to package the gold in two separate boxes with one box containing two kilograms of gold and the other box containing 3.3 kilograms of gold. Lewis also directed AV1 to package the boxes in Christmas paper with the white side facing out. Lewis then directed AV1 to write her

///

---

[1] In later communications that followed, Lewis referred to only one courier.

**Government's Motion for Pretrial Detention**                                                    **Page 7**

initials and the amounts on the boxes. AV1's son then proceeded to assist in preparing two decoy packages to match those previously packaged on video.

At approximately 3:45PM, Lewis called AV1 and stated the courier was outside, but upon opening her front door, AV1 found no one around. Soon thereafter, FBI Agents observed a Kia Soul with a Pennsylvania license plate parking near AV1's driveway, and then begin to proceed up the long driveway toward AV1 and AV2's residence. AV1 and AV2's residence is in Portland, Oregon. During this time, AV1 remained on the line with Lewis, who conveyed the password was "Richard." At approximately 3:50PM, the courier arrived at the door, and AV1 asked him for the password. The man, later identified as **Biao Lin** (hereinafter "**Lin**"), uttered the password "Richard," and AV1 then handed him the two boxes. After **Lin** gained possession of the boxes and began to walk away from the house, FBI Agents moved in and placed him in custody.

As FBI Agents engaged with **Lin**, **Lin** refused to acknowledge any understanding of the English language. Agents began efforts to obtain the assistance of a Mandarin interpreter to communicate with **Lin**. With the assistance of a Mandarin interpreter, Agents provided **Lin** his constitutional *Miranda* warnings, and **Lin** acknowledged understanding his rights and agreed to speak with the Agents. **Lin** explained he was randomly approached by an unknown Asian man about a week ago in a New York City library. **Lin** said was offered $200 to fly somewhere to pick something up, and he agreed. The man gave **Lin** a phone. **Lin** was told he would get instructions on that phone.

**Lin** stated he flew into Spokane, Washington on October 3, 2024, and he made no other stops except to drive directly to Portland. **Lin** said the person who gave him directions on the phone spoke Mandarin with a western accent. **Lin** stated he was told to pick up a package, but

he was not told any passwords.  **Lin** was supposed to get additional information via phone after picking up the package, but instead he was arrested.  **Lin** denied knowing what he was picking up.  He advised he had only his suitcase and backpack in the car, and he said the car did not contain any drugs, money, weapons, or gold.

On **Lin**'s person, Agents found what appeared to be part of a Delta boarding pass for a flight from Atlanta to Spokane.  No date or time was observed.  Concealed in **Lin**'s jacket was $5,000 in the form of 50 crisp one-hundred-dollar bills, and Agents found $1,394 in cash in his wallet.  **Lin** advised he had not yet been paid for making this pick up, as he was supposed to be paid afterward.  According to **Lin**, he had to pay for the car rental and flight on his own.

FBI Agents have been investigating a series of similar cases across the United States targeting elderly citizens.[2]  Two individuals in Oregon have been arrested and charged with being part of a criminal conspiracy in which a fictitious FBI agent named "Jon Stryker" was defrauding the victims out of hundreds of thousands of dollars in cash and gold.  *See United States v. Ganesan*, Case No. 3:24-mj-112 and *United States v. Singh*, Case No. 3:24-mj-150.  Both individuals, Indian nationals living in the United States, were detained at their initial appearances as flight risks.  The FBI in Chicago, Illinois is investigating a series of other cases involving the same "Michael Lewis" fraud scheme as this case that involves victims all across the country.  In addition to his involvement in the Oregon crime, a person matching defendant's appearance and driving a car registered to him was also identified as a courier who picked up

///

---

[2]    "Scams targeting individuals aged 60 and older caused over $3.4 billion in losses in 2023—an increase of approximately 11% from the year prior.  The average victim of elder fraud lost $33,915 due to these crimes in 2023."  *Elder Fraud, in Focus*, FBI NEWS (April 30, 2024) https://www.fbi.gov/news/stories/elder-fraud-in-focus

**Government's Motion for Pretrial Detention**                                    **Page 9**

four separate packages containing gold from another fraud victim on the East Coast that totaled $580,000. The full extent of this fraud scheme and the total number of victims is still unknown.

Agents have learned that defendant is a citizen of the People's Republic of China (PRC). And that it appears that he entered the United States illegally sometime in 2019. He has a pending application for legal status. Defendant lives in Brooklyn, New York.

The defendant is a risk of nonappearance and a danger to the community. He should be detained.

**B.    Applicable Law.**

**1.    Rules of Evidence Do Not Apply at Detention Hearing**

The Federal Rules of Evidence do not apply in pretrial detention proceedings. Fed. R. Evid. 1101(d)(3); 18 U.S.C. § 3142(f). Accordingly, both the government and the defense may present evidence by proffer or hearsay. *United States v. Winsor*, 785 F.2d 755, 756 (9th Cir. 1986); *see also United States v. Bibbs*, 488 F.Supp.2d 925, 925-26 (N.D.Cal. 2007).

**2.    Standard for Detention**

Where the government seeks a hearing and the Court determines that there is "a serious risk that [defendant] will flee," a detention hearing is warranted. 18 U.S.C. § 3142(f)(2). Once a detention hearing is conducted pursuant to § 3142(f), the Court shall order a defendant detained if it finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required **and** the safety of any other person and the community." 18 U.S.C. § 3142(e) (emphasis added).

When a defendant is eligible for detention under 18 U.S.C. § 3142(f)(2) – because of his risk of flight or risk of engaging in obstruction - rather than because of a qualifying § 3142(f)(1) charge – some courts, including Magistrate Judges in this District, have held that danger to the

**Government's Motion for Pretrial Detention**                                **Page 10**

community falls out of detention analysis. *See, e.g.*, *United States v. Himler*, 797 F.2d 156 (3rd Cir. 1986); *United States v. Ploof*, 851 F.2d 7 (1st Cir. 1988); *see also United States v. Twine*, 344 F.3d 987, 987 (9th Cir. 2003) (favorably citing *Himler* and *Ploof* without analysis); *United States v. Gunn*, Case No. 3:19-mj-207 (Mag. Ct. Or.). The government disagrees with this analysis and the plain text of the statute clearly says otherwise.

Once a detention hearing is triggered under § 3142(f)(2)(A), the detention statute asks the same question—can any set of release conditions ensure the defendant's appearance **and** the community's safety? 18 U.S.C. § 3142(e) (emphasis added). Once a risk of nonappearance has triggered the need for a detention hearing, the Court is to evaluate **both** risk of nonappearance and danger. *Id*. (emphasis added); ; *see, United States v. Holmes,* 438 F.Supp.2d. 1340, 1351 (S.D. Fla. 2005) ("[B]ased on a plain reading of the statute's unambiguous language and structure, the Act's legislative history" and prior court decisions "[t]his court is convinced that Congress intended that dangerousness be considered in all instances whether arising under subsection (f)(1) or (f)(2)."); *United States v. Cobix-Espinoza*, 655 F.Supp.3d 584, 591-92 (E.D. Ken. 2023) ("Where, as here, the United States moves for and is entitled to a detention hearing solely on the basis of the defendant's serious risk of flight under § 3142(f)(2)(A), the Court may examine, and order detention based on, the defendant's risks of nonappearance and danger. In other words, the Court's analysis under § 3142(e) is not tailored in any way by the Court's finding that the detention hearing was authorized only by the defendant's serious risk of flight under § 3142(f)(2)(A). . . . the Court is directed without limitation to assess the defendant's risk of nonappearance and danger to the community in determining whether detention is appropriate, regardless of the basis for the detention hearing."). The statute's text also lines up with the purposes of the Bail Reform Act. *See United States v. Salerno*, 481 U.S. 739, 742 (1987)

**Government's Motion for Pretrial Detention**                                            **Page 11**

(explaining that the Act was passed, in part, to address "the alarming problem of crimes committed by persons on release").

However, even those courts that follow the narrower reading seem to agree that when a defendant poses a serious risk of witness interference, he should not be released unless the court finds conditions sufficient to mitigate that risk.  *See Himler*, 797 F.2d at 160 (disallowing detention based on danger where there was no "claim that [defendant] would attempt to obstruct justice or intimidate a witness or juror.").

The United States bears the burden of establishing danger to the community by clear and convincing evidence; risk of flight need only be proved by a preponderance of the evidence. *United States v. Aitken*, 898 F.2d 104, 107 (9th Cir. 1990); *Winsor*, 785 F.2d at 757.  Concern about the safety of the community is not limited to concerns about violence; rather it is the *risk* that a defendant will continue committing crimes while on release that warrants their continued detention as a danger to the community:

> [T]he language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community.  The committee intends that the concerns about safety be given a broader construction than merely danger of harm involving physical violence.  This principal was recently endorsed in *United States v. Provenzano and Andretta*, in which it was held that the concept of 'danger' . . . extended to nonphysical harms such as corrupting a union.  The committee also emphasizes that the risk that a defendant will continue to engage in drug trafficking constitutes a danger to the "safety of any other person or the community."

S.REP. NO. 98-225, 98th Cong., 1st Sess. (1983), *reprinted in* 1984 U.S.C.C.A.N 3182, 3195 (Bail Reform Act)(emphasis added).

In determining whether the defendant poses a risk of non-appearance or a danger to the community, the Court should then examine the following four factors in deciding whether release is appropriate:

**Government's Motion for Pretrial Detention**                                    **Page 12**

(1)      the nature and circumstances of the offense charged. . . ;

(2)      the weight of the evidence against the person;

(3)      the history and characteristics of the person, including –

     (A)      the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearances at court proceedings; and

     (B)      whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal . . . ; and

(4)      the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.

18 U.S.C. § 3142(g).

## C.    Factors Supporting Detention.

Defendant is part of a criminal group targeting and defrauding senior citizens by hacking their computers and instilling in them the very real fear that their life savings are at risk – it was all a destructive scam used to steal millions of dollars. This criminal organization operates like a group of predatory locusts swarming across the country preying upon vulnerable people. The fear this group is inducing is traumatic and has led victims to lose millions of dollars. The defendant's status as a citizen of the PRC, with which the United States does not have an extradition treaty; lack of legal status within the United States; lack of family ties or confirmed and solid employment; penalties he is facing; and, lack of ties to Oregon make him an extreme a risk of nonappearance. Defendant's criminal conduct also demonstrates he is a danger to the community. He should be detained pending trial.

///

///

**Government's Motion for Pretrial Detention**                                **Page 13**

1.      **Nature and Circumstances of the Offense.**

Defendant is part of a conspiracy where his role is to pick up gold from the victims as part of a larger fraud scheme. The details of the investigation are outlined above and in the criminal complaint.

2.      **Weight of the Evidence.**

The weight of the evidence against the defendant is extremely strong and supports his continued detention. The details of the investigation are outlined above and in the criminal complaint.

3.      **History and Characteristics of the Defendant.**

The history and characteristics of the defendant also warrants his pretrial detention. Although defendant does not appear to have a criminal history, he is involved in an extensive nation-wide fraud scheme. In addition to his involvement in this case, a person matching defendant's appearance and driving a car registered to him was also identified as a courier who picked up four separate packages containing gold from another fraud victim on the East Coast that totaled $580,000. He is a Chinese citizen who illegally entered the United States. He told an FBI agent that he works at a restaurant in New York for two years, but said he could not remember the name of the place except to say that it has an American name. His criminal conduct places his ability to remain in the United States at risk. Defendant lives in New York and his sole connection to this district is his commission of a crime. He should be detained.

4.      **Nature and Seriousness of the Danger to the Community.**

This fraud scheme is exploitive, destructive, and extensive. Innocent people have been scared into transferring their assets to a group of fraudsters, believing they were being helped. The victims in this immediate case were terrified. For a retired couple who have saved their

entire lives to be faced with the prospect of losing everything is absolutely terrorizing. Danger to the community is not only physical violence, but it also encompasses financial and mental trauma as well. Defendant's crime was predatory and destructive. Defendant is a danger, a flight risk, and he should be detained.

**Conclusion**

For the reasons set forth herein, we respectfully request that the Court continue to detain defendant pending his arraignment and trial and find, by a preponderance of the evidence, he poses an unacceptable risk of non-appearance at future court hearings and, by clear and convincing evidence and pursuant to the text of the Bail Reform Act, that he is a danger to the community.

We ask the Court to find that:

- Pursuant to 18 U.S.C. § 3142(f)(2) and upon the government's motion, defendant's case involves a "serious risk" he will flee and thus a detention hearing is warranted pursuant to 18 U.S.C. § 3142(e).

- After evaluating the factors in 18 U.S.C. § 3142(g):

  - Due to the nature of the offense and the extreme financial dangers posed by defendant's fraud scheme there is no condition or combination of conditions that will reasonably assure the safety of other persons and the community if defendant were released.

  - Due to the weight of the evidence and defendant's personal history and characteristics, including the potential penalties he is facing on the current charges and his significant ties to a foreign country and another state, no condition or combination of conditions will reasonably assure the

appearance of the defendant at future court hearings as required if released

from custody.

We ask that defendant be detained pending arraignment and trial.

Dated:  October 7, 2024.                    Respectfully submitted,

                                            NATALIE K. WIGHT
                                            United States Attorney


                                            /s/ *Scott Kerin*
                                            _____
                                            SCOTT M. KERIN, OSB # 965128
                                            Assistant United States Attorney